# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JUNE 16, 2016
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2015-SC-000438-MR

FINAL

DATE 7-7-16 ElizA Growin, DC

FRANKFORT REGIONAL MEDICAL CENTER                    APPELLANT

ON APPEAL FROM COURT OF APPEALS
V.                    CASE NO. 2015-CA-000632-MR
FRANKLIN CIRCUIT COURT NO. 12-CI-00052


HONORABLE PHILLIP J. SHEPHERD,
JUDGE, FRANKLIN CIRCUIT COURT                    APPELLANT

AND

MARK WAINWRIGHT, M.D.; STEPHEN
HALL, M.D.; AND WOMEN'S CARE OF
THE BLUEGRASS, PLLC                    REAL PARTIES IN INTEREST


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

In this case, the appellant hospital's risk manager took notes recording statements made by nurses and physicians during an investigation after a difficult birth resulted in injury to the baby. There is evidence that the interviews had both a business purpose and a litigation purpose, although there is no proof that the nurses and physicians were aware of either purpose when they made their statements. Some of the facts believed to be recorded in the notes could not be recalled by the witnesses when they were later deposed in the course of a malpractice action.

At issue is whether those notes and the statements they contain are protected from discovery under the attorney-client privilege or the work-product doctrine. The trial court concluded that they were not. The Court of Appeals, upon a petition for a writ of prohibition, agreed and denied the requested writ. This Court affirms the Court of Appeals because neither the attorney-client privilege nor the work-product doctrine are applicable to the notes and statements under the evidence available at this point in the litigation.

## I. Background

The underlying case involves a medical malpractice claim related to the delivery and birth of Braylee Roberts to Courtney Wilhoite at Franklin Regional Medical Center on May 4, 2011. The delivery did not go well, and the child suffered brain injury and was later diagnosed with cerebral palsy.

Dr. Mark Wainwright was the obstetrician on call that day, but he was not present when the delivery first took a negative turn. His partner, Dr. Stephen Hall, was near the delivery room doing paperwork at that time. The problems with the delivery were arguably exacerbated by an issue with the fetal heart-rate monitor and by alleged miscommunication between nursing staff and Dr. Hall. As to the communication problem, nurses claimed that they asked Dr. Hall to assess Wilhoite because of concerns with the fetal heart-rate readings, but that he did not respond to those requests. It is not clear, however, whether the severity of the situation was fully explained to Dr. Hall. Regardless, after Dr. Hall failed to look in on Wilhoite, Dr. Wainwright was called in and he completed the delivery.

2

At some point after the delivery, the hospital's risk-management director, Pam Melton, interviewed the nursing staff and the physicians involved in the delivery. The factual circumstances surrounding these interviews, such as what was said during them, have not been fully developed at the trial court. What evidence we do have concerns when and why the interviews occurred, which is heavily disputed. There is no question, however, that the interviews resulted in a set of handwritten notes and a typed version of those notes (rendered in narrative form, with additional material apparently beyond the handwritten notes). We refer to this pair of documents collectively as the "notes" in this opinion.

The physicians claim that Melton began her interviews immediately after the birth as part of the hospital's standard business procedures in generating a document titled Root Cause Analysis, which is submitted to the Joint Commission[1] as part of an accreditation process. The hospital, however, claims that Melton's interviews did not begin until she received correspondence from the hospital's counsel directing her to undertake the interviews, and that the interviews were conducted in anticipation of litigation.

---

[1] According to its website, the Joint Commission is "[a]n independent, not-for-profit organization ... [that] accredits and certifies nearly 21,000 health care organizations and programs in the United States." The Joint Commission, *About the Joint Commission* (last visited Jan. 7, 2016), *at* http://www.jointcommission.org/about_us/about_the_joint_commission_main.aspx.

In January 2012, Wilhoite and the child's father filed a malpractice claim on behalf of their daughter against Drs. Wainwright and Hall, Women's Care of the Bluegrass, PLLC,[2] and Frankfort Regional Medical Center.

During the ensuing discovery, the Root Cause Analysis was produced, and at least one of the nurses and Pam Melton were deposed. In her deposition, Melton, according to the hospital's brief, "discussed at length ... the interviews she conducted, her recollection of events, the Root Cause Analysis, and an alleged disagreement that occurred between Drs. Wainwright and Hall at the time of Roberts' birth." Before long, the hospital settled with the plaintiffs and the claim against it was dismissed, leaving only the plaintiffs' claim against the physicians.

As discovery continued, the plaintiffs' counsel suggested that Dr. Hall's failure to respond to the nurses' requests for help had been because he had an argument or disagreement with Dr. Wainwright the day of the delivery. The physicians asked the plaintiffs' counsel to identify any witnesses to this disagreement. He apparently refused to do so but named a nurse who *might* have knowledge of it. She was re-deposed and claimed that she had not observed any disagreement but that she had heard a rumor of one having occurred.

A short time later, Wilhoite's counsel advised the physicians' counsel that he was aware of two other nurses who would testify about the claimed

2 The record is not clear, but Women's Care of the Bluegrass would appear to be the practice of Drs. Wainwright and Hall. Unless otherwise noted, references to "the physicians" as parties herein should be read to include Women's Care of the Bluegrass.

disagreement. The physicians' brief claims that the plaintiffs' counsel refused to identify these witnesses. Based on the e-mails included with the briefs, however, it is apparent that the nurses who were claimed to have knowledge of the dispute were identified explicitly. One of them was the one who had already been deposed and re-deposed about the alleged dispute. The other was a nurse named Bethany Abrams. Instead of the nurses' identity, it was the identity of the person who named the nurses that plaintiffs' counsel refused to produce. (He claimed that person's identity was "work product.")

The hospital's counsel eventually revealed in an e-mail to the physicians' counsel that she (the hospital's counsel) was likely the source of the plaintiff's information. According to the hospital's counsel, the only nurse she was aware of who had knowledge of a supposed dispute was Abrams, though she was unaware of the specifics. She identified two other nurses, one of whom she claimed had no knowledge of the dispute and one of whom she claimed did not recall a disagreement between the physicians.

The physicians became concerned that the supposed disagreement between them would become an issue at trial. On February 2, 2015, they served a subpoena duces tecum on the hospital seeking "any and all notes Pam Melton generated during interviews conducted for purposes of creating the root cause analysis of the events and circumstances surrounding the birth of Braylee Roberts." The hospital moved to quash the subpoena, claiming the notes were protected by both the attorney-client privilege and the work-product doctrine.

5

The trial court overruled the motion to quash. As to the work-product doctrine, the court concluded that the physicians had shown a substantial need for the notes and that they could not obtain the information elsewhere without undue hardship. As for the inability to obtain the information elsewhere, the court noted that the nurses had been deposed and none had testified about the alleged disagreement. The court also noted that the re-deposed nurse stated that she had not observed a dispute and had only heard about it from other staff, though she could not recall from whom. The court concluded "that given the amount of time that has passed, it is impossible for the [physicians] to obtain recollections from the nurses equivalent to those obtained and documented by Ms. Melton in her notes," and that the physicians "cannot obtain the information through further depositions." In reaching this conclusion, the court emphasized "the inability of the witnesses to recall in detail what happened the day Braylee [Roberts] was born," and also stated that the "notes are the most reliable source of information regarding what the nurses saw and reported."

The court also concluded that the notes were not prepared in anticipation of litigation, as required by *Duffy v. Wilson*, 289 S.W.3d 555, 559 (Ky. 2009), because Melton "was legally required to create these documents regardless of whether she was requested to do so by an attorney or whether she planned to give them to an attorney to obtain legal advice." This conclusion was based on the court's finding that the Root Cause Analysis was created in the regular course of business, as required by 902 KAR 20:016, §§ 3(3)(A)(5)–(6),

6

and that the "notes were generated for the purpose of completing the Root Cause Analysis."

As to the attorney-client privilege, the trial court again found that Melton "was required by law to create these documents regardless of what any attorney requested or whether she planned to use them to obtain legal advice." The court also stated that it was "not convinced that Ms. Melton's notes ... were solely the product of an investigation she was instructed to undertake by counsel." The court emphasized that the hospital "had a legal duty to complete a Root Cause Analysis report" and that the notes "were used to create that report." The court also noted that there had been no evidence that counsel requested the interviews before they were undertaken, and that it was more likely that counsel became involved *after* they were done. The court concluded its order by stating: "Based on a review of the record, ... the notes of Ms. Melton were produced in the ordinary course of business, to facilitate the completion of the Root Cause Analysis report ...."

The hospital filed a motion to reconsider along with a copy of a letter from the hospital's counsel, dated May 9, 2011 (five days after the birth), directing Melton to conduct an investigation of the birth and stating that the investigation would be protected by the work-product doctrine and the attorney-client privilege. Melton's own affidavit stated that although she did not recall the precise date she began her interviews, she did not do so until after receiving the letter.

The trial court denied the motion to reconsider and ordered the hospital to produce the notes. The court specifically found "that the interviews

7

conducted by Ms. Melton were initiated prior to her receipt of the letter from counsel." The court noted that some of the interviews appear to have been dated after the letter from counsel was sent, but that the "record is silent as to the exact date of any of the interviews" and that it "is clear from Ms. Melton's deposition testimony that she began the interview process in the days immediately following the incident, on May 4, 2011."

The court also pointed out that counsel's request for an investigation did not change the fact that the investigation had already been undertaken and was required by law (the administrative regulation). At best, the court concluded, the investigation took on a "dual purpose," but that was insufficient for the notes to fall under either the work-product doctrine or the attorney-client privilege. The court also noted that "it is most likely that all of these interviews would have been conducted in the same manner even if the letter from counsel had never been sent." The court then noted that the attorney-client privilege "is not designed to provide an *ex post facto* basis to cover-up highly relevant factual information that was developed by the hospital staff for its own internal review and quality control purposes, irrespective of potential litigation concerns," and reiterated that the "record establishes that Ms. Melton's internal investigation was initiated prior to the request of counsel."

The hospital then sought a writ of prohibition against the trial court's order. The Court of Appeals agreed that the remedy of a writ was available because, if the hospital's privilege claim was correct, there was no adequate remedy by appeal and the breach of the privilege would be a miscarriage of justice. But the court nevertheless declined to issue the writ, concluding that

8

the hospital had failed to show that Melton's notes were privileged or otherwise protected. The court agreed with the circuit court that Melton used her notes to generate the Root Cause Analysis and that Kentucky's administrative regulations required hospitals to generate incident reports and other documents. Based on these two conclusions, the court also agreed that the notes were not used solely for obtaining legal advice. Thus, the court concluded, the notes were not protected by the attorney-client privilege or the work-product doctrine.

The hospital now appeals to this Court as a matter of right. *See* CR 76.36(7)(a) ("An appeal may be taken to the Supreme Court as a matter of right from a judgment or final order in any proceeding originating in the Court of Appeals."); Ky. Const. § 115 ("In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court ...."). It has not asked this Court for intermediate relief under Civil Rule 76.36(4).

## II. Analysis

Generally speaking, cases in which a writ of prohibition or mandamus is sought proceed in two steps. *Collins v. Braden*, 384 S.W.3d 154, 158 (Ky. 2012). First, the court must look at whether such an extraordinary remedy is even available, before deciding the merits of the claimed legal error. *Id.* Second, if the court finds that the remedy is available, it may then look at the merits of the claimed error. *Id.* If the trial court has erred or is about to err, the court may issue the writ.

9

## A. Remedy by way of a writ is available.

The first question "is whether the hospital has established that remedy by way of an extraordinary writ is even available to it." *Id.* Under this approach, there are essentially "two classes of writs, one addressing claims that the lower court is proceeding without subject matter jurisdiction and one addressing claims of mere legal error." *Id.* at 158. The hospital has not made a claim under the first class, and thus we address only the second.

Under the second class, a writ *may* be granted—that is, the remedy is available—if "there exists no adequate remedy by appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted." *Hoskins v. Maricle*, 150 S.W.3d 1, 10 (Ky. 2004). Of the two prerequisites for this class of writ, the first is mandatory, and thus the hospital is required to prove that it has no adequate remedy by appeal. *Marcum v. Scorsone*, 457 S.W.3d 710, 716 (Ky. 2015). The second prerequisite, however, is more flexible. Though it usually requires proof of "something of a ruinous nature," it "may be put aside in 'certain special cases.'" *Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803, 808 (Ky. 2004) (quoting *Bender v. Eaton*, 343 S.W.2d 799, 801 (Ky. 1961)). That limited sub-class of cases consists of those in which "a substantial miscarriage of justice will result if the lower court is proceeding erroneously, and correction of the error is necessary and appropriate in the interest of orderly judicial administration." *Id.* (quoting *Bender*, 343 S.W.3d at 801). This includes those in which a privilege will be breached. *Id.*

Indeed, this court has held that an alleged violation of a privilege satisfies both writ prerequisites—that "of no adequate remedy by appeal, 'because

10

privileged information cannot be recalled once it has been disclosed,' and the substitute requirement in 'special cases' that the administration of justice would suffer." *Collins*, 384 S.W.3d at 158. For that reason, "remedy by a writ of prohibition is available to a petitioner claiming the potential violation of a privilege." *Id.*

This obviously extends to the claimed attorney-client privilege. *Id.* Though the work-product doctrine does not provide an absolute privilege, a breach of its protection has also been held to satisfy both elements of the special-cases writ test. *O'Connell v. Cowan*, 332 S.W.3d 34, 39 (Ky. 2010).

But availability of the remedy is not the end of our inquiry. We must still look at whether the petitioner, here the hospital, is entitled to the writ, which requires an examination of the merits of the claim of legal error. Here, we must examine whether the hospital has established "that the lower court has improperly ordered a disclosure that would violate a privilege." *Id.*

## B. Standard of Review

Before examining the merits of the hospital's privilege claim, however, we first need to speak to a misunderstanding about the standard of review. As noted above, the trial court made several findings of fact about the timing and purpose of Pam Melton's interviews and the notes she took. Findings of fact are traditionally reviewed for clear error, meaning they are to be sustained so long as there is substantial evidence to support them.

We noted in *Collins v. Braden*, however, that whether a "privilege applies is a mixed question of law and fact that is 'often reviewed de novo.'" 384 S.W.3d at 161 (quoting *Lexington Public Library v. Clark*, 90 S.W.3d 53, 62 (Ky. 2002)).

11

From this, we reasoned that "rather than deferring to the Court of Appeals [on the question of privilege], ... this Court must independently examine whether the hospital has shown at this time that the privilege applies." *Id.* The hospital has suggested that this would allow us to independently reach factual conclusions about the timing and purposes of the interviews different from those of the trial court. In other words, the hospital suggests, we would review the trial court's factual findings in this respect *de novo.* That is incorrect.

Although the ultimate question of the existence of a privilege is reviewed *de novo,* that determination consists of, and can be broken down into, constituent parts—questions of fact, questions of law, and mixed questions of law and fact (i.e., application of the law to the facts)—with each having its own standard of review. *See Trude,* 151 S.W.3d at 810 (distinguishing between the various aspects of a decision). Any finding of fact by the trial court is entitled to deference and will not be disturbed absent clear error. *Id.* Indeed, such deference makes even more sense in a writ action than in an ordinary appeal because we are proceeding on an "abbreviated record," which "magnifies the chance of incorrect rulings." *Cox v. Braden,* 266 S.W.3d 792, 795 (Ky. 2008).

Moreover, we are not reviewing the trial court's order in the strictest sense but, instead, are reviewing the Court of Appeals' action in granting or denying the writ petition, which is an original action in that court. That review has its own standards for the different aspects of the decision whether to grant the writ, but they apply to the Court of Appeals' decision, not the trial court's. *Trude,* 151 S.W.3d at 810. Because we are dealing with the second class of writs, we would ordinarily give some deference to the Court of Appeals to the

12

extent it determined the factual question of great and irreparable harm to the hospital. *Id.* But that is not really at issue in this case.

Instead, because we are addressing a question of evidentiary privilege under the special-cases exception, we review the trial court's underlying factual findings for clear error, while our review of whether the privilege applies, given the facts found by the trial court, is *de novo. Id.*[3]

### C. The hospital has not established that the contents of the notes are protected by the attorney-client privilege.

The hospital claims that the notes are protected by the attorney-client privilege. This is the broader of the two claims, as the attorney-client privilege is absolute, with very limited exceptions that do not apply here.[4]

The attorney-client privilege, as codified in KRE 503, grants "a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client." KRE 503(b). The privilege extends only to confidential communications, that is, communications "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those

---

[3] We have also noted repeatedly that whether to issue the writ is ultimately in the sound discretion of the court to which the petition was submitted if that court correctly found the *Hoskins* prerequisites had been shown. *Trude,* 151 S.W.3d at 810. That decision is subject to review for abuse of discretion. Of course, the Court of Appeals concluded in this case that the hospital had not shown the existence of the privilege—in other words, that the trial court was not acting in error—and thus did not issue the writ. By resolving the case in this manner, the Court of Appeals never reached the stage where it could exercise its writ discretion. Thus, the abuse-of-discretion standard for that decision is not at issue here.

[4] Those exceptions are addressed in KRE 503(d), and include things like communications made in furtherance of crime.

13

reasonably necessary for the transmission of the communication." KRE 503(a)(5).

The privilege, of course, protects such communications made by the client to the lawyer. KRE 503(b)(1). It also encompasses communications made by a "representative of the client" and those made to "a representative of the lawyer," *id.*, and extends even to communications between representatives of the client, KRE 503(b)(4), and between representatives of the lawyer and the lawyer, KRE 503(b)(2).

The client in this case was the hospital, but the communications claimed to be privileged are those made by the physicians and nursing staff to the risk-management director. Such communications can be covered by the privilege, however, as the physicians and the nurses can be representatives of the client. For the employees to be representatives of the client, and thus have their statements covered by the privilege, their communications must have been made "in the course and scope of [their] employment," about "the subject matter of [their] employment," and "to effectuate legal representation of the client." KRE 503(a)(2)(B). This distinguishes between employees who are actually acting in a representative capacity (and thus whose statements are cloaked by the privilege) and those who are "mere eyewitnesses," whose statements are not protected. *Collins*, 384 S.W.3d at 162. In other words, an employee representative must know that his statement is being given to obtain legal advice, or it is not privileged under the attorney-client privilege as set forth in the rule itself.

14

There is no question that the nurses and physicians interviewed made their statements in the course of their employment and that their statements were about the subject matter of their employment, because they were involved in the patient's care and their statements related to that care. *See St. Luke Hosps., Inc. v. Kopowski,* 160 S.W.3d 771, 776 (Ky. 2005) (applying privilege to statements by nurses involved in patient's care to risk manager). There is, however, some question whether their statements were made "to effectuate legal representation for the client," as discussed below.

The applicability of the privilege in a case like this turns on two questions. First, were "the statements ... made for the purpose of obtaining or furthering the rendition of legal services to the client"? *Collins,* 384 S.W.3d at 161 (citing KRE 503(b)). Second, were the communications actually confidential, "meaning they [we]re 'not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication'"? *Id.* (quoting KRE 503(a)(5)). These are actually related inquiries, as they focus on the circumstances surrounding the making of the statements and the purposes for which they were made. These inquiries are intended to distinguish between statements made wholly or primarily in the ordinary course of business or made by mere eyewitnesses, and those made by persons acting as agents of the client for the purpose of obtaining legal advice.

The trial court resolved the privilege question in this case by concluding that the notes were not for the purpose of facilitating the rendition of legal

advice. The court reached this conclusion because it found that: (1) the interviews were begun before communications were received from counsel, (2) the interviews served a dual legal-business purpose, and (3) the notes were used to make reports that were required to be made by law and thus were part of the ordinary course of business of the hospital.

We accept the trial court's finding that Melton began her investigations before the hospital's counsel contacted her. The record contains contradictory evidence on this point and would thus support a conclusion either way. Melton claimed that she did not act until receiving the lawyer's letter, yet the physicians point to one of their own affidavits showing that at least one of the interviews occurred before that letter was sent. Although the parties cite other evidence, these items alone would have supported the trial court's decision either way, and it was the trial court's job to resolve the discrepancy. The trial court's finding need only be supported by substantial evidence to be affirmed. The physician's affidavit was such evidence. Thus, we cannot say the trial court's finding on this point was clearly erroneous.

But the timing of the communications is not dispositive of the privilege question because the privilege does not depend on the statements' solicitation by counsel.[5] As noted above, the privilege extends to communications made for

---

[5] We held in *Haney v. Yates*, 40 S.W.3d 352, 354 (Ky. 2000), that a statement by a taxi-cab driver to the taxi company's in-house safety department was not made in furtherance of the rendition of legal services because no lawyer was yet involved in that case. That opinion, however, does not apply to this case, because the statements in question were not made by employees but by independent contractors. The question concerned the application of KRE 503's definition of a confidential communication, which extends to communications "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional

16

the purpose of obtaining legal advice, and it extends to statements made by representatives of the employer, both to the lawyer and his representatives and to other representatives of the employer as well, when made for the purpose of obtaining legal representation. It is easy to imagine that an employer could begin collecting confidential statements from its employees in anticipation of seeking legal advice before actually consulting with counsel. No doubt, the practice is common. Such internal, confidential dialogue, if its primary purpose is to obtain legal advice, can be protected by the privilege. *Cf. Collins*, 384 S.W.3d at 160 (stating privilege may apply to statements collected pursuant to a hospital's internal policies, rather than directions of counsel, if they were "made as part of a comprehensive program by which the hospital seeks to determine, with the assistance of counsel, the best legal strategy to pursue in regard to the tort that may have happened on the hospital's premises").

Requiring the privilege to turn on solicitation by counsel would render it largely meaningless. The privilege is to be viewed from the perspective of the client, not the lawyer. It exists to encourage the client to be open and frank with counsel, and to thus facilitate the attorney-client relationship. That the client speaks first should not render the statement unprivileged. Rather, the

---

legal services to the client or those reasonably necessary for the transmission of the communication." KRE 503(a)(5). The case went on to address the insurer-insured extension of the attorney-client privilege as applied to self-insured entities.

Additionally, *Haney* did not address the second way to make a communication confidential: making it to someone "reasonably necessary for the transmission of the communication." KRE 503(a)(5). An in-house risk manager who will liaise between the client and the lawyer to be employed is the sort of person reasonably necessary for the transmission of the communication to counsel.

purpose of the client in making the statement controls the applicability of the privilege.

It is also important to remember that the representative of the client essentially stands in the shoes of the client for purposes of the privilege's application. If the statements in this case had been made directly by the client to the lawyer, without the lawyer's solicitation, they would be protected as long as they were for the purpose of soliciting legal advice and were confidential. That they were instead made by a representative of the client to yet another representative of the client or a representative of the lawyer does not extinguish the privilege. *See Lexington Public Library v. Clark*, 90 S.W.3d 53, 59 (Ky. 2002) ("If the communication would have been privileged if made to the attorney, it is no less privileged because it was made to [another employee] who forwarded it to the attorney.")

Nevertheless, the trial court also concluded that the interviews were not taken for the purpose of obtaining legal advice, as required by KRE 503, because they were also used to prepare the Root Cause Analysis, which the trial court concluded was required by law to be prepared. Indeed, the court specifically found, at first, that the sole purpose of Melton's investigation was to assist her in preparing the Root Cause Analysis, which was a business purpose. After being presented with a letter from the hospital's counsel directing Melton to investigate, the court concluded that the investigation had a dual purpose, which still barred the privilege.

The physicians make much of the trial court's conclusion that Melton's investigation was undertaken, at least in part, to facilitate the production of a

18

report purportedly required by law. The law in question is 902 KAR 20:016 § 3(3), which regulates hospital operations and states that "administrative reports shall be established, maintained and utilized as necessary to guide the operation, measure of productivity and reflect the programs of the facility." *Id.* § 3(3)(a). Those reports "shall include ... [i]ncident investigation reports; and ... [o]ther pertinent reports made in the regular course of business." *Id.* §§ 3(3)(A)(5)–3(3)(A)(6). A plurality of this Court recently suggested that this regulation extends to reports sent to accreditation entities, like the Joint Commission. *See Tibbs v. Bunnell*, 448 S.W.3d 796, 804 (Ky. 2014). The trial court anticipated this approach, concluding that the Root Cause Analysis was required to be created under the regulations. The trial court, however, reasoned further that if this report had to be created, then any and all interviews used in preparing the report were also "required" and thus were not for the purpose of obtaining legal advice.

It does not necessarily follow that the regulation required the interviews and other investigative steps undertaken by Melton simply because they were ultimately used to prepare the Root Cause Analysis.[6] It is theoretically *possible* that the investigation might have been undertaken in a different manner if its

---

[6] *Tibbs*'s suggestion that accreditation reports are required by the regulation is also questionable. As the hospital notes, the regulation qualifies the required reports with "as necessary." 902 KAR 20:016 § 3(3)(a). But who is to determine what is necessary in this context? If it is the hospital, then it is the hospital's decision that led to the creation of the report, not the regulation. Moreover, Melton's deposition established that the Root Cause Analysis was not an "incident report" as that phrase is commonly used in hospital administration. It could then fit, at best, under the catch-all provision for documents generated in the ordinary course of business. But reporting to the Joint Commission is voluntary. That a hospital undertakes such reporting as part of its business again suggests that it is the hospital that dictates whether the report is generated, not a government regulation.

19

only purpose was to prepare the Root Cause Analysis. As the hospital points out, the Root Cause Analysis focuses only on processes at the hospital and does not seek to assign fault or blame to individuals; in fact, individual actors are not even to be identified in that report, according to the Joint Commission's own requirements. And we have noted: "Whether a particular communication is privileged depends (absent waiver) not on what use was ultimately made of the communication, but on the facts and circumstances under which the communication was made." *Lexington Public Library*, 90 S.W.3d at 59.

Of course, the trial court found that it was "likely" that the investigation would have proceeded in the same manner even if counsel had not asked for it. And having reviewed the notes themselves, which have been filed under seal, this Court agrees that it is unlikely that they would have been taken in a substantially different form. The notes primarily name the various persons interviewed and attribute various statements to them. Although the Root Cause Analysis does not require that the various actors be named, it still requires some reference to their identity, e.g., as an on-call physician, rather than one who is merely present or a nurse. Given this necessity, we do not see how Melton's notes would have been different if she had never been contacted by the hospital's counsel.

We need not delve into the thorny questions raised by the application of *Tibbs* and this regulation, however. Regardless of whether the interviews were required to be undertaken, the fact is that their results were used to prepare the Root Cause Analysis. Pam Melton admitted this fact, going so far as to state that she kept a copy of her notes for this purpose. Even assuming that the

20

hospital was not required by law to prepare the Root Cause Analysis, the simple fact is that it did prepare the document.

And the trial court found that preparation of this document was one of the purposes behind Melton's investigation. This finding of fact is also supported by substantial evidence—namely, Melton's own admission that she prepared the Root Cause Analysis from her notes and kept a copy of them for that purpose—and is not clearly erroneous.

Moreover, that is a business purpose. The hospital is correct that preparing for litigation is not part of the ordinary course of business of a hospital *per se. Cf. Palmer v. Hoffman*, 318 U.S. 109, 113 (1943) ("But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act."). Rather, the hospital's business is operating a hospital. Although that no doubt includes, primarily, treatment of patients and provision of medical care, it extends beyond that to all of the day-to-day operations of such a facility. It would extend, for example, to practices "aimed at reducing waste or hiring qualified employees." *Collins*, 384 S.W.3d at 160.

That would not necessarily extend to activities such as investigations of torts committed on the hospital's premises; such activities are often, instead, "for the purpose of assessing the risk of and preparing for possible litigation." *Id.* It is for that reason that such records are not included in the hearsay exception for records of regularly conducted activities. *See Palmer*, 318 U.S. at 113 (1943); *see also Timberlake Const. Co. v. U.S. Fidelity and Guar. Co.*, 71

21

F.3d 335, 342 (10th Cir. 1995) ("It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business."). Litigation, even if it is a common occurrence and has an effect on a business, requires the party to step outside its ordinary business.

But incident investigations, at least under circumstances like those in this case, can also have a business purpose. The *ex post facto* assessment of an incident can have a business purpose where, for example, it is aimed at future preparation and remedial measures, or at simply maintaining basic safety standards. It can also be part of an accreditation process, as was the case here where the Root Cause Analysis was submitted to the Joint Commission. Accreditation may be required by law, or it may simply make the business more attractive to customers (or, in this case, patients). In a hospital, where life and death is literally on the line, constant self-examination and assessment of risk is necessarily part of the daily operation of that business and thus has a business purpose unrelated to litigation.

The question, then, is whether statements made for a dual purpose— both for obtaining legal advice *and* for a business purpose, such as preparing accreditation reports—are protected by the privilege. We need not go so far as to say that a communication is protected by the privilege only if it had as its sole purpose the obtaining of legal advice. But obtaining legal advice must be the primary or predominant purpose of the confidential communication to fall under the privilege.

This Court has not expressly laid out that rule before, though it has suggested it. *See Lexington Public Library*, 90 S.W.3d at 59-60 ("Finally, '[w]hen

22

the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected simply because legal considerations are also involved.'" (quoting *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 643–44 (S.D.N.Y. 1987))). But it makes sense because the attorney-client privilege "protects only those disclosures *necessary* to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States,* 425 U.S. 391, 403 (1976) (emphasis added). And it appears to be the general rule across the United States. *See* 1 Paul Rice et al., *Attorney-Client Privilege in the United States* § 7:6 (2015–2016 ed.) ("Although courts occasionally state that the client's communications to the attorney must be 'solely' for the purpose of seeking legal advice for the privilege to apply, there is general agreement that the protection of the privilege applies only if the *primary* or *predominant* purpose of the attorney-client consultation is to seek legal advice or assistance." (footnotes omitted) (citing federal cases)).

Where the disclosures are made with dual purposes, and the business purpose is equal or predominant, they cannot be covered by the privilege, at least where they would have been made for the business purpose anyway. And here, as the trial court found, the interviews would likely have been conducted in the same manner regardless of counsel's directions to undertake them. Conversely, when the predominant purpose is in furtherance of litigation, the privilege does apply, providing the communication was confidential.

The physicians, of course, argue that because Melton's interviews and notes had at least a dual purpose, just as the trial court held, the privilege does not apply. But we are concerned about the interviews only to the extent that

23

they elicited *confidential* statements from possible representatives of the hospital—the physicians and nurses. In this scenario, as an investigator, Melton was simply a pass-through for the statements, which did not lose any applicable privilege simply because they were not communicated to the attorney directly. Instead, the statements are to be treated as though they were made by the employees (who, if they are representatives of the client, are to be treated as the client) directly to the lawyer. And despite the physicians' and trial court's suggestions otherwise, Melton's subjective purpose in undertaking the interviews does not control whether the privilege applies.

The relevant *purpose* for determining the privilege is the purpose of the client on whose behalf the statements are made, here, the hospital. But the employees' statements can only fall under the attorney-client privilege if they were acting as representatives of the client in making the statements. Again, a representative of the client stands in the shoes of the client, making the statement essentially that of the client.

As mentioned briefly above, there are three requirements for an employee to be considered a representative of the client. The first two of these—that the communications were made in the course and scope of employment, and were about the subject matter of the employment—are clearly shown here.

The difficult question concerns the third requirement: that the employee made the "confidential communication ... [t]o effectuate legal representation for the client." KRE 503(a)(2)(B). Implicit in this requirement is that, to some extent, the employee's awareness of the purpose of the communication he or she makes is relevant in determining the privilege. If the employee is ignorant

24

of the reason he or she is being interviewed, how can the statements be reasonably understood to be confidential or made "to effectuate legal representation"? They cannot.

Indeed, this understanding was part of the U.S. Supreme Court's reasoning in extending the privilege to statements made by a mere employee (rather than restricting it to members of a corporation's "control group") in *Upjohn Co. v. United States*, 449 U.S. 383 (1981). As the Court noted, such employees can be representatives of the client in making privileged statements if they are *"sufficiently aware* that they were being questioned in order that the corporation could obtain legal advice." *Id.* at 394 (emphasis added).

Although *Upjohn* is not binding on this Court, our KRE 503, which extends the privilege to statements made by a representative of the client, is modeled after the system laid out in that decision. *See Lexington Public Library*, 90 S.W.3d at 59 (noting KRE 503 embodies the more expansive federal approach). And though we have not expressly held that the employee's awareness of the purpose of the statements is relevant in determining whether the privilege applies, we have declined to find a privilege where "the record [wa]s silent as to ... whether, at the time the communications were made, the persons who made them were aware that the communications were being elicited to effectuate legal, as opposed to business, advice." *Id.* at 63. This approach is consistent with that of other jurisdictions that have adopted the

representative-of-the-client model of the privilege over the control-group approach.[7]

We expressly hold today that statements by a corporate client's employee can be privileged only if the employee is aware that his or her statements are being elicited for the purpose of obtaining legal advice. This is consistent with the very rationale behind the privilege—that is, to encourage clients (and their representatives) to be frank with their lawyers in furtherance of the attorney-client relationship. If an employee does not have reason to know that a statement he or she makes is for the purpose of obtaining legal advice, the purpose of the privilege is not served.

Thus, the subjective intent or purpose of the corporate client's or lawyer's investigator (like Pam Melton) who questions another employee of the client, does not, by itself, clothe the employee's responses in the privilege. At the same time, the employee's subjective intent in making the statements, to the extent it differs from the corporate client's, also does not control the applicability of the privilege, and thus the privilege cannot be defeated by an employee later claiming to have made the statements for a purpose other than obtaining legal

---

[7] For examples, see *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court for City and Cty. of Denver*, 718 P.2d 1044, 1049 (Colo. 1986) (noting absence of employee's awareness as one of several reasons for rejecting privilege claim); *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 218 (W.D. Ky. 2006) ("The attorney-client privilege also extends to communications made by noncontrol group employees ...while the employees were aware that they were being questioned in order that the corporation could obtain legal advice"); *United States ex rel. Hunt v. Merck-Medco Managed Care, LLC*, 340 F. Supp. 2d 554, 556-57 (E.D. Pa. 2004) (noting that "privilege applies when ...the employees were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice"); *Bruce v. Christian*, 113 F.R.D. 554, 560 (S.D.N.Y. 1986) ("Attorney-client privilege extends to any employee communicating on matters within the scope of his employment when that employee is aware that he is being questioned in confidence in order for his employer to obtain legal advice.").

advice. When the employee in question makes the statements toward legal representation, he or she is acting as an agent of the employer. And it is the purpose of the employer, as the client, that dictates the existence of the privilege. However, the employer's purpose must be communicated to the employee, or the employee must be aware of it in some other way (such as if it is standard practice in the company to collect such statements to obtain legal advice).

The trial court thus erred by focusing solely on Pam Melton's purpose in undertaking the interviews and making her notes. That purpose may not have been communicated to the nurses and physicians, though it would obviously be relevant if it had, and they may not have otherwise been aware of it.

The pertinent question is whether the nurses and physicians were aware of why Melton was obtaining the statements. Did she tell them that she was questioning them in anticipation of litigation? Was it the standard practice in the hospital to undertake such questioning for that purpose? Or did Melton possibly tell the nurses and physicians that she was questioning them to prepare the accreditation reports, either in whole or in part? We simply do not know the answers to these questions.

It is very likely, given the nature of risk management's ordinary role in the day-to-day functioning of a hospital, that the nurses were aware of why they were being questioned. But that showing has not been made in this case. As we have stated on many occasions, privileges of all stripes are to be strictly construed. *E.g.*, *Collins*, 384 S.W.3d at 159 ("The analysis in any privilege case 'begins with the almost universally accepted rule that testimonial privileges are

generally disfavored and should be strictly construed.'" (quoting *Stidham v. Clark*, 74 S.W.3d 719, 722–23 (Ky. 2002))). And "the burden is on the party claiming the privilege to prove that it exists as to the communications so claimed." *Collins*, 384 S.W.3d at 161 (quoting *St. Luke Hosps.*, 160 S.W.3d at 775). That burden, therefore, falls to the hospital.

At least on the current record, we cannot conclude that the hospital has met that burden to establish that the privilege applies. It has offered no evidence that the nurses and physicians were aware of why Melton was questioning them. In many hospital cases, there is no question on that subject. But here, there is evidence that Melton herself had a mixed motive in undertaking the interviews and that she used the interviews, at least after the fact, for a business purpose. We know only that Melton, at least after receiving the attorney letter, had a mixed purpose, but that does not resolve the question.

We note that unlike in *Collins*, the hospital has at least filed the notes in question under seal with this Court. But our review of those notes does not disclose the purpose for which any of the statements recorded in them was made.

"This is not to say that the privilege does not apply to any of the statements." *Collins*, 384 S.W.3d at 164. It is possible that the statements were, in fact, made primarily to assist the hospital in obtaining legal advice and to prepare for a possible lawsuit, despite Melton's subjective purpose, and that the nurses and physicians were aware of why they were being questioned by Melton. The record simply does not show that at this time. But, as in *Collins*,

28

"the hospital still has the opportunity in the future to establish that the privilege covers the documents or at least parts of them." *Id.* at 165. While we do not issue a writ at this time, it may be that the hospital can show other proof of whether the nurses and doctors knew their statements were being taken for the purpose of litigation, thus making them confidential for the purpose of securing legal representation. A timely motion to the trial court for leave to produce proof consistent with this opinion would stay discovery of the statements until the motion could be heard. Any further inquiry, however, should focus on the hospital's purpose in having the statements taken and the extent that the persons making the statements were aware of that purpose, not on Pam Melton's subjective purpose.

## D. The hospital has not established that the notes are covered by the work-product doctrine.

The remaining question is whether Melton's notes should have been shielded from discovery under the work-product doctrine. The work-product protection stems from Civil Rule 26.02(3). It is not a pure privilege, in that it is simply a bar on discovery and is far from absolute.

Applicability of the protection is determined by a two-part test:

> First, the court must determine whether the document is work product because it was prepared "in anticipation of litigation." … Second, if the document is work product, the court must determine whether the requesting party has a "substantial need" of the document and is unable to obtain the "substantial equivalent" without "undue hardship."

*Duffy v. Wilson*, 289 S.W.3d 555, 559 (Ky. 2009). The trial court held that the hospital had failed on both counts.

29

We have stated that the test for determining if the document was prepared in anticipation of litigation is "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* (quoting 8 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure* § 2024 (2d ed. 1994)). This is commonly referred to as the "'because of' standard." *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006).

On this point, the trial court concluded that Melton's notes had not been made in anticipation of litigation because they had been made as part of producing the legally required Root Cause Analysis. We need not address the validity of the trial court's conclusion in this regard—though, as noted above, it is questionable whether the Root Cause Analysis is legally compelled by the administrative regulations cited by the trial court—because it does not matter whether the Root Cause Analysis was required by law or generated voluntarily. The relevant facts are that the hospital did complete the Root Cause Analysis and, as also found by the trial court, that Melton's notes were generated, at least in part, to prepare that document. Here, the purpose of the interviewer is relevant, and the trial court found that she had a dual purpose at the very least.

That the notes were prepared for dual purposes, one of which was an ordinary business purpose, is arguably dispositive of the work-product question. The because-of approach "withholds protection from documents that are prepared in the ordinary course of business or that would have been

30

created in essentially similar form irrespective of the litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998). And as discussed above, Melton's investigation and resulting notes were part of the hospital's ordinary business because their purpose, even if only in part, was to help in preparing the Root Cause Analysis for submission to the Joint Committee

Yet the hospital argues that a dual purpose does not by itself remove a document from the work-product privilege. It cites federal cases stating, for example, that "a document can be created for both use in the ordinary course of business and in anticipation of litigation without losing its work-product privilege." *Roxworthy*, 457 F.3d at 599. This Court does not disagree, but that quote does not mean a document is protected simply because it has any litigation purpose or use. As *Roxworthy* states in the same paragraph, "documents do not lose their work product privilege merely because they were created in order to assist with a business decision, *unless the documents would have been created in essentially similar form irrespective of the litigation.*" 457 F.3d at 598–99 (emphasis added) (internal quotation marks and brackets omitted) (quoting *Adlman*, 134 F.3d at 1202).

And as the trial court also found, "it is most likely that all of these interviews would have been conducted in the same manner even if the letter from counsel had never been sent." This is not exactly the same as concluding that the *notes*—that is, the documents that are claimed to be protected here—would have been made in essentially similar form, but it is close enough. And, again, having reviewed the notes themselves, which have been filed under seal,

31

this Court concludes that there is no reason to think that they would have been taken in a different form simply because litigation was anticipated.

For that reason, this Court concludes that at this point the hospital has not shown that the notes were prepared in anticipation of litigation, so they are not covered by the work-product protection. Because they are not work product, we need not address the exception to that doctrine, even though the trial court did.

### III. Conclusion

Because the hospital has so far failed to prove that the attorney-client privilege or the work-product doctrine protected Melton's notes, this Court cannot say that the trial court erred in ordering their production. For that reason, the order of the Court of Appeals denying the writ of prohibition is affirmed.

Minton, C.J.; Cunningham, Noble and Venters, JJ., concur. Keller, J., concurs in result only by separate opinion in which Hughes and Wright, JJ., join. Wright, J., concurs in result only by separate opinion in which Hughes, J., joins.

KELLER, J., CONCURRING IN RESULT ONLY: I concur with the majority that, at this point in time, the hospital has not established that the attorney-client privilege protects Melton's notes from discovery. I write separately to clarify what I believe should be the appropriate analysis with regard to the attorney-client privilege.

Initially, I note that I agree with the majority that it is not clear that "the interviews and other investigative steps undertaken [by Melton] were required

by [902 KAR 20:016 § 3(3)] simply because they were ultimately used to prepare the Root Cause Analysis." Whether Melton undertook the investigation pursuant to regulation or in the regular course of business is not dispositive. If Melton began and completely conducted her investigation simply to fulfill a regulatory requirement (whether required by law or by business practice) that investigation would likely not fall under the protective umbrella of the attorney-client privilege. However, if Melton began the investigation to fulfill a regulatory requirement but then continued the investigation at the request of counsel, at least part of the investigation might fall under that protective umbrella. The fact that the investigation was begun for one purpose does not mean that purpose "colors" the entirety of the investigation. Once Melton received the May 9, 2011 letter, the focus, scope, and purpose of the investigation could have changed. However, as the majority notes, there simply is not enough information in the record to make this determination.

I also agree that it is certainly possible that the investigation had a dual purpose. Melton admitted that she conducted this investigation, in part, to prepare the Root Cause Analysis. She also stated that she did not begin her investigation until after she received the May 9, 2011 letter. Therefore, the record supports the circuit court's finding of a dual purpose.

The circuit court found that the investigation undertaken by Melton would have been the same whether she undertook the investigation to fulfill a regulatory requirement or at the request of counsel. The majority agrees; however, I disagree. Before the circuit court can compare one investigation to another, there must be some evidence regarding how each investigation is

33

undertaken. Here the only evidence is how Melton undertook this investigation. There is nothing in this record for the court to use as a comparison; therefore, there is no evidence to support the circuit court's conclusion that Melton's investigation would have proceeded along the same path regardless of her purpose.

Furthermore, I agree with the majority that, when determining if the attorney-client privilege has attached to a statement, the trial court must examine why the statement was made, *i.e.* was it made for "the purpose of facilitating the rendition of professional legal services to the client." KRE 503(b). However, I disagree with the majority's conclusion that the purpose of the interviewer should not be considered. The trial court must examine both the purpose of the interviewer and the purpose of the interviewee. This is particularly true in cases such as this, where the interview is not being conducted by the attorney or a non-client representative of the attorney, but by an individual who is also the client. As the circuit court and the majority recognize, the interview process may have been different depending on whether Melton was conducting it in order to complete the Root Cause Analysis or at the request of counsel. Therefore, Melton's purpose for conducting the interviews, while perhaps not controlling, is not wholly irrelevant.

Finally, I agree with the majority that "the hospital still has the opportunity in the future to establish that the privilege covers the documents or at least parts of them." *Collins*, 384 S.W.3d at 164. The circuit court should refrain from enforcing its disclosure order until the parties have had the opportunity to develop proof regarding the preceding. In re-assessing the

34

applicability of the attorney-client privilege, the circuit court must keep in mind the following: simply because an investigation begins as an unprivileged activity does not mean that it continues to be unprivileged throughout its existence; and when determining whether the privilege attaches, the purpose of both the investigator and the client/interviewee must be established and considered. Furthermore, the circuit court must have some evidence regarding the differences and/or similarities between a root cause analysis investigation and an attorney requested investigation, before it can determine what type of investigation Melton undertook. In other words, there must be some objective evidence setting forth what distinguishes a privileged investigation from an unprivileged one.

Hughes and Wright, JJ., join.

WRIGHT, J., CONCURRING IN RESULT ONLY: While I fully concur on all other grounds, I concur in result only as to the majority's attorney-client privilege analysis. Here, the hospital is the entity seeking legal advice. The hospital hired the attorney in order to obtain legal advice, and the interviewee and interviewer were both employees of the hospital acting within the scope of their employment. The motives of these parties was to do their jobs. Therefore, that motive is immaterial. The motive of the hospital (as shown through the actions of its Board of Directors, executives, employees, and applicable policies and procedures) should control the attorney-client privilege analysis.

Hughes, J., joins.

35

COUNSEL FOR APPELLANT:

Bryan Todd Thompson
Millicent Ann Tanner
Eleanor M. B. Davis
Chad Owens Propst
Thompson Miller & Simpson, PLC
734 West Main Street, Suite 400
Louisville, Kentucky 40202


APPELLANT:

Honorable Phillip James Shepherd
Circuit Judge, Franklin Circuit Court
Franklin County Judicial Center
222 St. Clair Street
Frankfort, Kentucky 40601


COUNSEL FOR REAL PARTIES IN INTEREST:

Clayton Lee Robinson
Jonathan David Weber
Kimberly Goetz Desimone
Robinson & Havens, PSC
101 Prosperous Place, Suite 190
Lexington, Kentucky 40509

36