RENDERED: APRIL 2, 2015
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2014-SC-000172-MR

FINAL

DATE 4-23-15 [signature]

FRANK D. MARCUM; JAMES D.
CONWAY; FOSTER NORTHROP; AND
MARK CHENEY                                                    APPELLANTS


V.                    ON APPEAL FROM COURT OF APPEALS
                          CASE NO. 2013-CA-002146-OA
                  FAYETTE CIRCUIT COURT NO. 12-CI-00040


HON. ERNESTO SCORSONE, JUDGE,
FAYETTE CIRCUIT COURT                                          APPELLEE

AND

PAUL R. PLANTE, JR.                          REAL PARTY IN INTEREST


## OPINION OF THE COURT BY JUSTICE NOBLE

### REVERSING AND REMANDING

Appellants, Frank D. Marcum, James D. Conway, Foster Northrop, and

Mark Cheney, sought a writ of prohibition in the Court of Appeals to bar

enforcement of an order disqualifying their lawyers, the firm Miller, Griffin, &

Marks, PSC (MGM), in a shareholder-derivative suit brought by the Real Party

in Interest, Paul R. Plante, Jr., where the order was granted based on a finding

of an "appearance of impropriety." The Court of Appeals denied the writ,

concluding that one of the prerequisites for a writ, specifically a showing of

irreparable harm, had not been made. This Court concludes that the

Appellants have adequately shown the prerequisites for the availability of a writ

and that the trial court applied an incorrect legal standard ("an appearance of

impropriety") in disqualifying the firm. Moreover, disqualification was improper under the correct standard (a showing of actual conflict), at least based on the current record and findings of the trial court. Thus, this Court reverses and remands for entry of the requested writ.

## I. Background

The shareholder-derivative suit underlying this writ action gives an excellent corporate representation of the infamous "Gordian knot." The Real Party in Interest (Plante) and the Appellants (Marcum, Conway, Northrop and Cheney), along with Bill Seanor, began their journey as the shareholders of Arthrodynamic Technologies Animal Health Division, Inc. (ADT), a Kentucky corporation that sells veterinary products. Originally, Marcum and Conway each owned 37.5% of the shares; Cheney owned 10%; and Northrop, Plante, and Seanor each owned 5%. All six shareholders were originally on the board of directors. Over time, disputes among the shareholders led to changes in the officers and membership of the corporate board.

In late 2010, Plante and Seanor seized control of the board, apparently having convinced a majority of the directors that Marcum and Conway had acted improperly, and caused Marcum and Conway to be removed from the board.[1] Plante and Seanor were installed as the secretary and president respectively. In February 2011, Conway and Marcum, holding a total of 75% of

---

[1] There is some suggestion in the record that at that time, Marcum and Conway agreed to leave the board, though there is no written document signed by all of the board members, as arguably required by the shareholder agreement, executing this action.

2

the shares of ADT, returned to the board, though Plante and Seanor remained in their role as officers.

In March 2011, a majority of the board caused the corporation to file a lawsuit against Marcum and Conway in Fayette Circuit Court alleging breach of fiduciary duties, misappropriation of corporate funds, and other claims. The suit was later transferred to Woodford Circuit Court. Miller, Griffin and Marks (MGM) represented Marcum and Conway individually in that action through the services of Thomas Miller.

On August 29, 2011, Bioniche Animal Health USA, Inc., which had been ADT's manufacturer, filed suit against ADT in federal court over a contract dispute. ADT was defended in the litigation by Stites & Harbison PLLC, a Kentucky law firm, and Sutherland Asbill & Brennan LLP, a firm headquartered in Atlanta.

In October and November 2011, there was some shaking up of the board's membership related to Marcum's claimed purchase of shares owned by Northrop, Cheney, and Conway.[2] Northrop tendered his resignation from the board, which was accepted at an October board meeting. In October, Cheney also executed a resignation letter, addressed to Seanor as president, but the

---

[2] Plante has, at times, disputed that these purchases actually occurred, citing a right of first refusal for ADT to purchase the shares in the shareholder agreement. Whether Marcum's purchases actually occurred, however, is not a question that this Court must decide in order to resolve this case or, more pertinently here, to lay out the factual background sufficiently to understand the case. Indeed, whether Marcum actually purchased the shares or was required to allow ADT to exercise the right of first refusal, and thereby increase the overall value of the remaining shares, appears to be part of the underlying litigation. That Marcum purported to buy the shares is discussed only to explain the apparent change of heart of the board. Even the Appellants' brief describes the Appellants as collectively owning 90% of the shares, suggesting all still had an ownership stake, at the time of the October and November meetings.

3

letter was never delivered and was instead held by Marcum's counsel. Upon acceptance of Northrop's resignation, Bob Watson[3] was named to the board in his stead. On October 31, 2011, a board meeting was held at which Seanor was removed as president and replaced by Marcum, Cheney was made vice-president, Seanor was made secretary, and Watson was made Treasurer.

At the board meetings in October and November 2011, MGM attorneys were present, recorded minutes, and participated in discussions with the board members. Before the November meeting, Marcum, acting as president, sent letters to the litigation firms asking that they take no further action in the Bioniche litigation. At the November 2011 meeting, MGM advised the directors to settle with Bioniche. Plante was a director at the time, and he objected to the settlement. Three of the four Appellants (Marcum, Cheney, and Conway) were also on the board at that time, however, and they, along with Watson, voted in favor of settling. Though the record does not disclose the exact timing, it appears that the lawsuit by ADT against Marcum and Conway was also discussed at these meetings, and it was dismissed soon after.

That, however, means that the suit by ADT against Marcum and Conway overlapped with the Bioniche litigation against ADT. Both were ongoing actions as of the October and November 2011 board meetings. As a result, MGM represented the two individuals, Marcum and Conway, in an action brought by ADT, at the board's behest, at the same time that the firm was advising the board in some capacity about the Bioniche suit.

---

[3] Watson was employed by a bank that had dealings with ADT.

On January 3, 2012, the underlying shareholder derivative action was filed by Plante and Seanor (who has since settled his claim) in Fayette Circuit Court.[4] The original complaint named only two of ADT's directors, Marcum and Conway, as defendants. On April 18, 2012, Northrop came back on the board, replacing Watson. After some discovery, the complaint was amended to also name Cheney and Northrop as defendants. The suit alleges, among other things, that the Appellants had violated various provisions of ADT's shareholder agreement with respect to sales of stock. MGM was retained to represent Appellants as they defended against this claim. Another law firm, Stoll Keenon Ogden, represents ADT, which was included in the suit as a nominal party on whose behalf Plante has brought the suit.

On June 18, 2012, Plante moved to disqualify MGM as the counsel for the Appellants, alleging that because MGM had represented the board, including Plante, in giving advice on the Bioniche litigation, and because MGM had represented Marcum and Conway individually in ADT's suit against them in Woodford County, MGM's participation in the underlying shareholder action created a conflict of interest or at least an appearance of impropriety sufficient to require MGM's disqualification. In other words, because MGM represented Marcum and Conway against ADT (of which Plante was a board member) in the Woodford County suit, and then represented the board in the Bioniche suit (by advising the board), MGM effectively acted as counsel both against the board

---

[4] Plante had also filed suits in federal and state courts in Florida in December 2011.

5

and for the board. By extension, Plante, as a shareholder, argued that MGM had taken a position against him and represented him at the same time.

In January 2013, Marcum, Conway, Cheney, and Northrop met, acting as a quorum of the board. They adopted a resolution stating that there was no conflict of interest in MGM's representation of them "with respect to ADT," and purporting to waive any conflict that might exist.

Briefing and arguments regarding this motion and other matters occurred for some period of time. (The exact scope of these proceedings is not clear because a writ action does not contain the entire record of an underlying lawsuit.) Eventually, however, the motion was submitted for decision, and the trial court ruled in Plante's favor, granting his motion to disqualify MGM from representing the Appellants. The court specifically found that "[d]uring the course of MGM's representation of Conway and Marcum in the lawsuit filed against them by ADT, MGM also provided legal advice to the board of directors of ADT in a separate lawsuit with Bioniche."

But then the trial court specifically found, in the next two sentences, that it was making "*no finding* on whether Miller and MGM provided legal advice in their capacity as representative of Conway and Marcum or with the intent to represent ADT in settlement negotiations with Bioniche," and "*no finding* as to any actual impropriety on the part of Miller and MGM." (Emphasis added.) The court then said that it was difficult to see how Plante, as a part owner of the corporation ADT, could perceive that he got "utmost advocacy" when MGM represented "both the corporation [in advising about Bioniche] and individuals adverse to the corporation [in the suit against Conway and Marcum]." The

6

court then concluded that disqualification of MGM was required based on "the appearance of impropriety" under *Lovell v. Winchester*, 941 S.W. 2d 466 (Ky. 1997).

The Appellants filed a writ action at the Court of Appeals. The court denied the writ because they had not shown irreparable injury, one of the usual prerequisites for issuance of such a writ.

The case is appealed to this Court as a matter of right.

## II. Analysis

The issuance of a writ of prohibition or mandamus is an extraordinary remedy that interferes with the ordinary trial and appellate processes. As a result, this Court has always been cautious and conservative in granting such relief. *Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803, 808 (Ky. 2004). Because writs are disfavored, a court's first task in a writ action is to determine whether the remedy is even available. *Bender v. Eaton*, 343 S.W.2d 799, 801 (Ky. 1961). This is done before looking at the merits of the allegation of legal error claimed to support issuance of the writ. *Id.*; *see also Cox v. Braden*, 266 S.W.3d 792, 796 (Ky. 2008). To this end, "this Court has articulated a strict standard to determine whether the remedy of a writ is available." *Cox*, 266 S.W.3d at 796.

That standard divides writs into two separate classes: where the lower court is alleged to be proceeding outside its jurisdiction and where the lower court is within its jurisdiction but is alleged to be acting or about to act erroneously. *Hoskins v. Maricle*, 150 S.W.3d 1, 10 (Ky. 2004). Appellants invoke the second class of writ cases, alleging that the trial court acted erroneously but within its jurisdiction. Accordingly, they generally are required to pass two

7

"tests" by showing (1) that they lack an adequate remedy by appeal or otherwise, and (2) that great injustice and irreparable injury will result if their petition is not granted. *Id.* Failure to show these prerequisites usually results in denial and dismissal of the writ action, *Bender*, 343 S.W.2d at 801, as the Court of Appeals did in this case.

As we have noted on multiple occasions, this standard "require[s] the petitioner to pass the first test; i.e., he must show he has no adequate remedy by appeal or otherwise." *Id.* But unlike the lack of an adequate remedy by appeal, the second test (great injustice, irreparable injury) "is not an absolute prerequisite." *Hoskins*, 150 S.W.3d at 20.

Instead, if great injustice and irreparable injury cannot be shown, a writ is still available in "certain special cases," that is, if "a substantial miscarriage of justice will result if the lower court is proceeding erroneously, *and* correction of the error is necessary and appropriate in the interest of orderly judicial administration." *Id.* (quoting *Bender*, 343 S.W.2d at 801). By granting a writ "in such a situation the court is recognizing that if it fails to act the administration of justice generally will suffer the great and irreparable injury." *Bender*, 343 S.W.2d at 801.

Here, the Court of Appeals held that the Appellants could not show irreparable harm from being deprived of representation by MGM as the basis for denying the writ. That determination requires further scrutiny by this Court, however, because the Court of Appeals did not address the first prerequisite, i.e., whether there is an adequate remedy by appeal or otherwise,

and because it did not consider the special-cases exception to the second prerequisite.

It is undeniably true here that the first prerequisite is met because there is no adequate remedy by appeal. If a client is forced to trial without the attorney of his choice, losing the services of a particular attorney is simply not an appealable matter in a civil case. Issues that will be considered on appeal go to the *substantive* issues, not to a *collateral* issue that has no direct bearing on the legal issues in the case. Even an attorney not of one's choosing can successfully try a case, resulting in nothing to appeal once the case is concluded. And if the attorney makes mistakes that affect the outcome of the case adversely to the client, the remedy lies in a malpractice claim against the lawyer, not in reversal of the case for another trial.[5] Thus while the question of disqualification has been addressed during a trial, it cannot be the subject of a direct appeal based on the outcome of the trial. This effectively means that unless trial courts are to be allowed to rule in a vacuum as to who can represent a litigant—a situation rife with potential for abuse—there must be *some* avenue of review, either through an interlocutory appeal or a writ action. And denial of the right to counsel of choice has never fallen within the small class of cases in which interlocutory appeals are allowed.

And it *is* certainly problematic if a decision of a trial court to disqualify an attorney cannot be adequately reviewed on appeal. The effect of this is to

---

[5] That is not necessarily the case if the trial court declines to disqualify the attorney and it turns out the attorney had an actual conflict. If the party claiming the conflict loses, the disqualification could taint the judgment and allow reversal. *See, e.g., Whitaker v. Commonwealth,* 895 S.W.2d 953, 954-58 (Ky. 1995).

9

allow trial court action that gets no review, regardless of the propriety of the ruling. The unreviewability of the decision is troubling, given that if the shoe were on the other foot, with the trial court declining to disqualify a lawyer with an actual conflict, a writ would certainly be an appropriate remedy. *See Commonwealth v. Maricle*, 10 S.W.3d 117, 121 (Ky. 1999). While this concern may not go directly to a finding of irreparable harm, it raises alarm bells about the orderly administration of justice.

As to this second test, whether the Appellants can show great injustice and irreparable injury, it is true that we have stated recently that the denial of counsel of choice in a civil case did not rise to this level. *See Robertson v. Burdette*, 397 S.W.3d 886, 890 (Ky. 2013). But we did not say in that case that denial of counsel of choice could *never* rise to the level of great injustice and irreparable injury. In fact, we held that the appellant had failed to make the requisite showing "[u]nder the circumstances described" in that case, *id.* at 891, while noting, and distinguishing, another case in which this Court had previously found that a trial court's disqualification of a lawyer had risen to the level of great injustice and irreparable injury and thus justified a writ, *id.* at 890 (discussing *Zurich Ins. Co. v. Knotts*, 52 S.W.3d 555 (Ky. 2001)).

More importantly, we did not address the special-cases exception in *Robertson* beyond noting that the appellant had not argued the exception and summarily concluding in a footnote that the case did not fall under it. *See id.* at 890 n.4. Although the Appellants have likewise not argued in favor of the exception, this Court cannot so readily dismiss its applicability in this case. And this case is readily distinguished from *Robertson* factually, given that the

10

trial judge in *Robertson* found the existence of an actual conflict of interest, whereas the judge in this case found only an appearance of impropriety. Unlike *Robertson*, this case is a prime example of when the special-cases exception could apply, at least when considered in light of this Court's decision as to the appearance-of-impropriety standard as laid out below.

In disqualifying MGM, the trial judge, to his credit, was simply following precedent, namely, *Lovell v. Winchester*, 941 S.W.2d 466 (Ky. 1997). He justified the disqualification because he saw an *appearance* of impropriety. He was bound by this Court's decision to apply that standard.

But this Court is not so bound, except by the force of stare decisis. And this Court has concluded that disqualification based on an appearance of impropriety is inappropriate under the existing Rules of Professional Conduct. It is telling that the appearance-of-impropriety standard does not appear in those rules, except in commentary *condemning* its use and noting that it has been deleted from the rules. *See* SCR 3.130-1.9 Sup. Ct. Cmt. 5 (2009). Although this Court has previously upheld the use of that standard in deciding lawyer disqualification questions in *Lovell*, 941 S.W.2d at 469, the standard must now be rejected. Disqualification under that standard is "little more than a question of subjective judgment by the former client." SCR 3.130-1.9 Sup. Ct. Cmt. 5. In essence, all the former client has to do is claim discomfort with the subsequent representation to create the appearance that something untoward is going on and thus that there is an appearance of impropriety. Moreover, "since 'impropriety' is undefined, the term 'appearance of impropriety' is question-begging." *Id.* Even if impropriety is the same as an actual conflict,

11

there should be something more substantive than just a *possible* conflict before disqualification takes place.

The simple fact is that disqualification is easier to achieve under the appearance-of-impropriety standard. While that is appropriate for judicial recusal questions, *see* SCR 4.300, Canon 2 ("A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities."), because there is a heightened concern about public confidence in the judiciary, that concern is less pressing when dealing with the private lawyer-client relationship. If anything, use of such a low standard in that context creates a "greater ... likelihood of public suspicion of both the bar and the judiciary" and "would ultimately be self-defeating," *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir. 1976), because it creates the impression that courts are ruling based on appearances rather than facts. Before a lawyer is disqualified based on a relationship with a former client or existing clients, the complaining party should be required to show an actual conflict, not just a vague and possibly deceiving appearance of impropriety. And that conflict should be established with facts, not just vague assertions of discomfort with the representation.

There is no doubt that personal choice of representation is based on a litigant's belief in the competency of chosen counsel, and the confidence placed in counsel. Even though all practicing lawyers are presumed to be competent, common sense dictates that not all lawyers share the same degree of competence. Otherwise, clients would not care who their lawyers were, and there would be little competition among lawyers for business. A litigant has the

12

reasonable expectation that he will have the best representation he can and is willing to afford, and taking his chosen counsel away based on an "appearance" alone creates the belief that the court is arbitrary or capricious. That undermines faith in the judicial process, which, in turn, clearly affects the orderly administration of justice negatively in general and, in that specific case, irreparably. On the other hand, specific findings of an actual conflict refute arbitrariness, and promote faith in the fairness of the proceeding.

*Lovell* applied a standard that is no longer a part of the Rules of Professional Conduct and is simply inadequate to preserve the interests involved when a conflict of interest is alleged. To the extent that *Lovell* and other cases have approved the appearance-of-impropriety standard, they are overruled. Instead, in deciding disqualification questions, trial courts should apply the standard that is currently in the Rules of Professional Conduct, which at this time requires a showing of an actual conflict of interest.

To resolve that question, the trial court must hold an evidentiary hearing. And before disqualifying counsel, the court must find that an actual conflict exists, and state on the record what that conflict is. To the extent that the trial judge did not do this, consideration of a special-cases writ is appropriate in this case. Thus, a writ is available as a remedy.

Moreover, this Court concludes that the writ should issue. In many ways, the trial court in this case complied with what we require today for disqualification of counsel. The trial court ordered briefing on the disqualification issue, and conducted multiple hearings. The court heard evidence and did not rely merely on allegations in motions and pleadings. And,

13

as noted above, the trial court applied the standard previously approved by this Court.

But, also as noted above, that standard is no longer appropriate under the Rules of Professional Conduct. A mere appearance of impropriety, as found by the trial court in this case, cannot support disqualification of counsel. Such an extreme remedy must be based on an actual conflict of interest. And the trial court's order specifically stated it was not finding an actual impropriety, that is, an actual conflict.

Although the Court's order stated that MGM had represented ADT at the same time that it represented individuals adverse to ADT, that does not, by itself, support disqualification in the shareholder-derivative suit. First, it is not entirely clear that MGM actually represented the corporation when providing advice on whether to settle the Bioniche litigation. In fact, the trial court's order specifically states that it "makes no findings on whether Miller and MGM provided legal advice in their capacity as representatives of Conway and Marcum or with the intent to represent ADT in settlement negotiations with Bioniche." And ADT, as a corporate entity, had been represented by other counsel in that litigation. Although Plante has argued that MGM represented the corporation, whether that was actually the case is less than clear. Thus, the concern that MGM may have been both for and against ADT at the same time may be unfounded. At the very least, there are insufficient findings in the trial court's order to show an actual conflict.

Second, even if there was an actual conflict when MGM advised the board about the Bioniche litigation, while also representing Marcum and

14

Conway against ADT, that conflict only extended to the Bioniche litigation. Once that case settled, and the Marcum-Conway case was dismissed, there was no longer a conflict stemming from the simultaneous representation—and certainly not one that extends to the derivative suit underlying this action.

For that reason, this Court concludes the trial court's disqualification order was improper under the standard articulated today. A writ of prohibition barring its enforcement is the appropriate remedy.

This is not to say, however, that Plante cannot show a sufficient conflict to have MGM disqualified once this case returns to the trial court. It is possible that by advising the board, of which Plante was a member, about the Bioniche litigation, MGM was representing Plante. Since the allegedly improper resolution of the Bioniche litigation is part of the underlying derivative suit, among other things, it is possible that MGM may have an actual conflict under Rule of Professional Conduct 1.9, which governs duties to former clients. There has also been some suggestion that MGM now represents the entire board, including Plante, in the derivative action, although only the Appellants appear to have been named as defendants. If MGM is representing the entire board, that could give rise to a conflict with an existing client under Rule 1.7.

But the focus in the trial court appears not to have been these possible conflicts, but the conflict that previously existed in the Bioniche litigation itself. Regardless, the trial court's order does not have findings sufficient to show such a conflict based on duties to former clients, and this Court cannot make such findings, especially based on the limited record in a writ action. If the issue is raised again in the trial court, it will be necessary to establish exactly

15

who represents and has represented whom, and when the representation occurred before the conflict issues can be resolved. It will also be necessary to establish the precise relationship of the parties to each other and in what capacities they have sued or been sued.

### III. Conclusion

The Court concludes that review of the disqualification order in this case is available through the special-cases exception for writs. Further, this Court concludes the trial court applied a disqualification standard that is no longer appropriate under the Rules of Professional Conduct, and that the trial court's factual findings are insufficient to allow disqualification under the proper standard of a showing of actual conflict. For those reasons, a writ of prohibition barring enforcement of the trial court's order is appropriate at this time, even though the issue of disqualification may be revisited in the trial court. The Court of Appeals' decision to deny the writ is therefore reversed, and this matter is remanded to that court to issue the writ.

All sitting. Minton, C.J.; Abramson, Barber, Cunningham, Keller, JJ., concur. Venters, J., concurs in result only by separate opinion.

VENTERS, J., CONCURRING IN RESULT ONLY: I concur in the result reached by the Majority, but I believe it is unnecessary to invoke the "special" case writ. As the majority holds, the trial court's disqualification of Appellants' trial counsel on the mere *appearance* of a conflict of interest, rather than a finding of an *actual* conflict of interest, was error. However, I am satisfied that the erroneous disqualification of one's trial counsel does irreparable damage to the attorney-client relationship, an injury for which there exists no adequate

16

remedy by way of appeal or otherwise. Therefore, I believe Appellant's are entitled to relief under the more conventional "second-class" writ recognized in *Hoskins*. I would reserve the "special" case writ for circumstances that more generally jeopardize the orderly administration of justice in the Commonwealth.


COUNSEL FOR APPELLANTS:

Thomas W. Miller
Elizabeth C. Woodford
Michelle Lynn Hurley
Miller, Griffin & Marks, PSC
271 West Short Street, Suite 600
Lexington, Kentucky 40507


APPELLEE:

Hon. Ernesto Scorsone
Judge, Fayette Circuit Court
Robert F. Stephens Courthouse
120 North Limestone
Lexington, Kentucky 40507


COUNSEL FOR REAL PARTY IN INTEREST:

William B. Rambicure
Miller Wells, PLLC
300 East Main Street, Suite 360
PO Box 34188
Lexington, Kentucky 40507-1464

Albert F. Grasch, Jr.
Crista Dittert Hollingsworth
James L. Thomerson
Grasch Law, PSC
302 West High Street
Lexington, Kentucky 40507