# IN THE SUPREME COURT OF TEXAS

═══════════

No. 18-0737

═══════════

IN RE MURRIN BROTHERS 1885, LTD., ERI-BBTX, LLC, AND CONCHO MINICK, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF BILLY BOB'S TEXAS INVESTMENTS, LLC, PHILIP MURRIN, AND COWTOWN CONCESSIONS, INC., D/B/A RIVER RANCH STOCKYARDS

═══════════

ON PETITION FOR WRIT OF MANDAMUS

═══════════

**Argued October 10, 2019**

JUSTICE BLACKLOCK delivered the opinion of the Court.

The parties to this mandamus action are warring ownership factions of "the world's largest honky-tonk," the iconic Fort Worth establishment Billy Bob's. Both sides, the Hickman Group and the Murrin Group, assert the right to control the management of Billy Bob's. The litigation began in May 2017. By January 2018, it was nearly ready for trial, when the Murrin Group, relators in this case, moved to disqualify the Hickman Group's lawyers. Conflicts of interest can require disqualification of counsel in some circumstances, even at a late stage of the case, and courts must carefully examine alleged conflicts to ensure the integrity of the judicial process. In these circumstances, however, the Murrin Group relators have not established a clear entitlement to the harsh remedy of attorney disqualification. Nor have they established their lack of an adequate remedy at law if the case proceeds with its current alignment of parties and counsel. For the reasons explained below, the Court denies mandamus relief.

## I. Factual and Procedural Background

Billy Bob's is a historic entertainment venue located in the Fort Worth Stockyards. In 2011, the three long-time owners of Billy Bob's—Steve Murrin, Don Jury, and Holt Hickman— decided to reorganize the company. They brought in additional owners and collectively formed Bill Bob's Texas Investments (BBT), a closely held LLC, to own and manage Billy Bob's. BBT's owners adopted a Company Agreement, which dictates BBT's structure and contains rules for the management of BBT. One of those rules requires unanimous consent of the owners to any "matter within the scope of any major decision." Among the "major decisions" requiring unanimous consent is "settling, prosecuting, defending or initiating any lawsuit, administrative or similar actions concerning or affecting the business of BBT LLC and/or the BBT LLC Property." After adopting the Company Agreement, the owners received a Certificate of Formation for BBT from the Secretary of State. The Certificate of Formation lists six "Governing Persons" of BBT, all of whom are either owners of BBT or closely related to an owner or ownership entity.

On January 1, 2011, Concho Minick, both an owner and a Governing Person, was unanimously elected President and Managing Member with "full power and authority to make and carry out all decisions in connection" with "the ordinary, daily and routine business affairs of BBT." Several years later, nine of BBT's twelve owners—and four of its six Governing Persons— became dissatisfied with Minick's performance. This opinion refers to the anti-Minick faction as the Hickman Group. In May 2017, the Hickman Group attempted to dismiss Minick by a majority vote of the Governing Persons.

Despite the Hickman Group's attempt to dismiss him, Minick claimed a right to remain as President and Managing Member. He claimed his dismissal was a "major decision" for which the

2

Company Agreement required a unanimous vote of the owners. Under that theory, the Hickman Group's dismissal of Minick was invalid because three owners—Minick himself, Murrin Brothers 1885, Ltd., and ERI-BBTX, LLC—opposed Minick's dismissal. Two Governing Persons— Minick and Steve Murrin—opposed the dismissal as well. This opinion refers to the pro-Minick faction as the Murrin Group. Generally speaking, the Murrin Group are the Relators in this mandamus action, while the Hickman Group are the Real Parties in Interest.[1]

The Murrin Group responded to the Hickman Group's attempt to dismiss Minick by filing the underlying lawsuit against the Hickman Group. The suit contained claims asserted individually by the members of the Murrin Group and claims asserted derivatively on behalf of BBT. The suit sought injunctive relief to prevent the Hickman Group from acting unilaterally on behalf of BBT and the appointment of a receiver for BBT to break the intractable gridlock allegedly caused by the unanimity provision. It also sought a declaration that the four Governing Persons in the Hickman Group lacked authority to replace Minick as Managing Member without a unanimous vote.

The Hickman Group hired the law firm of Kelly Hart & Hallman (KHH) to represent BBT in the litigation and to represent the defendants named in the Murrin Group's suit. The engagement letter with KHH was signed by BBT's CFO as well as nine of BBT's twelve owners and four of its six Governing Persons. It appears to be undisputed that KHH's legal fees have been paid from BBT's funds, both for its representation of BBT itself and at least to some extent for its

---

[1] The terms "Hickman Group" and "Murrin Group" are used for convenience and, hopefully, for clarity. They are not intended to have any legal significance. Both groups contain several entities and individuals, and we do not suggest that all members of each "Group" share identical interests or are perfectly aligned procedurally in every nook and cranny of this complex case.

representation of the individuals and entities comprising the Hickman Group. KHH filed counterclaims, again on behalf of both the Hickman Group members individually and on behalf of BBT derivatively. The counterclaims also sought appointment of a receiver for BBT.

Between May 2017 and January 2018, the parties engaged in active litigation, including competing summary judgment motions, which the trial court denied in November 2017. The case was set for trial in April 2018. In January 2018, the Murrin Group filed a motion to disqualify KHH as counsel for BBT and as counsel for the Hickman Group. The motion alleged that because BBT is the "plaintiff" in the Murrin Group's derivative claims against the Hickman Group, KHH's representation of both BBT and the Hickman Group amounts to the impermissible representation of both sides in the same case. And because BBT is really a plaintiff, the Murrin Group alleged, KHH must also be disqualified from representing the individual Hickman Group defendants who are adverse to KHH's former client, BBT. In March 2018, the Murrin Group filed a Rule 12 motion, which required KHH to "show [its] authority" to represent BBT. TEX. R. CIV. P. 12. The Rule 12 motion argued that the decision to hire counsel on behalf of BBT was a "major decision" requiring unanimous agreement of the owners. The Hickman Group's principal response was that the Certificate of Formation granted them authority to hire counsel for BBT with a simple majority of the Governing Persons.

The trial court denied both motions. It did not explain its denial of the motion to disqualify. As to the Rule 12 motion, the trial court explained in writing that the letter of representation and BBT's Certificate of Formation constituted the "sufficient authority" required by the rule. The Murrin Group sought mandamus relief in the court of appeals as to the denial of both motions. The court of appeals denied relief without explanation. The Murrin Group filed a petition for writ

4

of mandamus in this Court, challenging the denials of the Rule 12 motion and the motion to disqualify.

## II. Analysis

### A. Standard of Review

Mandamus is an extraordinary remedy and will only issue if the lower court has clearly abused its discretion and the relators have no other adequate remedy. *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding). Mandamus relief is only appropriate when the relators have established that only one outcome in the trial court was permissible under the law. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985) (orig. proceeding), *overruled on other grounds by In re Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d 204, 213 (Tex. 2009) (orig. proceeding). It is meant for circumstances "involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding) (quoting *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex. 1989) (orig. proceeding)).

### B. Disqualification Motion

We start with the motion to disqualify KHH. The inappropriate denial of a motion to disqualify is an abuse of discretion for which there is generally no adequate remedy on appeal. *In re Turner*, 542 S.W.3d 553, 555 (Tex. 2017) (orig. proceeding). The remaining question is whether the trial court abused its discretion when it denied the motion to disqualify. We conclude that it did not.

Disqualification of counsel is a severe remedy that can result in significant expense to clients, disrupt the orderly progress of litigation, and deprive a party of the counsel of its choice.

5

*In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding). The Murrin Group alleges that KHH is violating several disciplinary rules, including Rule 1.06(a) and Rule 1.09, by representing parties on both sides of the same lawsuit.[2] Although courts and litigants often "look[] to our disciplinary rules to decide disqualification issues," *In re Meador*, 968 S.W.2d 346, 350 (Tex. 1998) (orig. proceeding), the rules "do not determine whether counsel is disqualified in litigation." *Nat'l Med. Enters. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996) (orig. proceeding). Rather, the rules "provide helpful guidance" and "suggest the relevant considerations." *Id*. Ultimately, a court "must consider all the facts and circumstances to determine whether the interests of justice require disqualification." *Meador*, 968 S.W.2d at 350.

Even if a violation of the disciplinary rules is established, the party requesting disqualification must also show it will suffer prejudice if disqualification is not granted. *Nitla*, 92 S.W.3d at 422. In addition to the movant's burden to show prejudice, the trial court should also consider "the extent to which the nonmovant will suffer prejudice from the disqualification of his or her attorney." *Meador*, 968 S.W.2d at 350. Such prejudice to the nonmovant may include the financial burden of obtaining substitute counsel that is not already familiar with the case. *See Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 434 (1985) ("To be sure, an order granting disqualification itself leads to delay. Alternate counsel must often be retained. . . . [S]uch counsel will need time to gain the knowledge of the disqualified attorneys."); *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine*, 60 F. Supp. 3d 751, 766–68 (E.D. Tex. 2014) (discussing the cost of disqualification in both time and money). It may also include denial of the nonmovant's right to

---

[2] TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.06(a), 1.09, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9).

be represented by the counsel of its choice. *In re Sanders*, 153 S.W.3d 54, 57 (Tex. 2004) (orig. proceeding). There is also the potential for tactical abuse by the party seeking disqualification. When ruling on disqualification motions, "courts must adhere to an exacting standard . . . to discourage their use as a dilatory trial tactic." *In re RSR Corp.*, 568 S.W.3d 663, 666 (Tex. 2019) (orig. proceeding) (per curiam) (quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding)) (internal quotation marks omitted).

The foundation of the Murrin Group's disqualification argument is the notion that the Hickman Group and BBT are directly adverse to one another—that they are "opposing parties" for purposes of Rule 1.06(a). According to the Murrin Group, BBT is a plaintiff in the derivative action, and the members of the Hickman Group are the defendants. As the Murrin Group sees it, if KHH represents both BBT and the Hickman Group, it is representing both the plaintiff and the defendant in the same case. Representing both sides in one case is the axiomatic conflict of interest, the Murrin Group contends, and it should never be tolerated. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.06(a) ("A lawyer shall not represent opposing parties to the same litigation.").

The battle lines are not so clear, however. Shareholder derivative actions provide a procedural pathway for a minority shareholder to sue on behalf of the company for wrongs committed against the company. *Sneed v. Webre*, 465 S.W.3d 169, 182–83 (Tex. 2015); *Eye Site, Inc. v. Blackburn*, 796 S.W.2d 160, 162 (Tex. 1990); *see also* TEX. BUS. ORGS. CODE §§ 21.552, 101.452 (outlining requirements for derivative suits). Because the suit is to vindicate the company's rights, it is often said that the company is a "plaintiff" in a derivative action. *See, e.g.*, *Ross v. Bernhard*, 396 U.S. 531, 538 (1970); *Clark v. Lomas & Nettleton Fin. Corp.*, 79 F.R.D.

7

658, 659 (N.D. Tex. 1978); *Nat'l Bankers Life Ins. Co. v. Adler*, 324 S.W.2d 35, 36 (Tex. App.—San Antonio 1959, no writ); *cf. In re Schmitz*, 285 S.W.3d 451, 452 (Tex. 2009) (orig. proceeding). Labeling the company a "plaintiff" does not tell the whole story, however. Most companies begin derivative litigation resistant to the minority shareholder's derivative claims. The resistance of the company's usual decisionmakers to the minority shareholder's claims is what causes derivative litigation in the first place. For this reason, in addition to sometimes being called plaintiffs, companies embroiled in derivative litigation are also commonly called "nominal defendants." *See, e.g.*, *Meyer v. Fleming*, 327 U.S. 161, 167 (1947); *Bankston v. Burch*, 27 F.3d 164, 167 n.10 (5th Cir. 1994); *Neff ex rel. Weatherford Int'l, Ltd. v. Brady*, 527 S.W.3d 511, 518 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Thus, companies in derivative litigation are simultaneously "plaintiffs" and "defendants," depending on how you look at it. Of course, if the company is literally both plaintiff and defendant, then no lawyer could ever represent it in derivative litigation because to do so would automatically place the lawyer on both sides of the case. Obviously, that is not the rule.

Rather than labor over which party label applies to a company in derivative litigation, the proper inquiry is to look to whether the substance of the challenged representation requires the lawyer to take conflicting positions or to take a position that risks harming one of his clients. *Nat'l Med. Enters.*, 924 S.W.2d at 132 ("Adversity is a product of the likelihood of the risk and the seriousness of its consequences."). Courts around the country are divided on whether such a risk is always present in derivative litigation. Some courts have concluded that representation by one law firm of both the company and the insider defendants is categorically impermissible. *See In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1188–89 (N.D. Cal. 1993) ("Here, because Oracle's special

settlement committee lacked independent counsel, the derivative settlement reeks of collusion between derivative plaintiffs' counsel and the individual defendants, at the expense of the corporation."); *see also In re Conduct of Kinsey*, 660 P.2d 660, 669 (Or. 1983) (requiring separate counsel unless the claim is "patently sham or patently frivolous"); *Rowen v. LeMars Mut. Ins. Co. of Iowa*, 230 N.W.2d 905, 914 (Iowa 1975) (holding that the potential for a conflict of interest is so great as to require representation by independent counsel). Other courts, including in Delaware, have taken a more practical approach, reasoning that the interests of the company and its controlling officers or directors are often aligned, and separate counsel is not necessary unless a divergence of those interests arises. *Respler on Behalf of Magnum Hunter Res. Corp. v. Evans*, 17 F. Supp. 3d 418, 421 (D. Del. 2014) ("[I]n derivative actions, there exists no conflict of interest between a corporation and individual director defendants at the motion to dismiss stage."); *Marcum v. Scorsone*, 457 S.W.3d 710, 719 (Ky. 2015) (holding that common representation is not independent grounds for disqualification in a shareholder derivative suit); *Scattered Corp. v. Chi. Stock Exch., Inc.*, No. 14010, 1997 WL 187316, at *6–8 (Del. Ch. Apr. 7, 1997); *Robinson v. Snell's Limbs & Braces of New Orleans, Inc.*, 538 So. 2d 1045, 1048–49 (La. Ct. App. 1989) ("[T]here is no conflict of interest because there are really no adverse interests being represented."). Some courts have held that serious allegations of fraud or insider dealing against managers may trigger adversity between the company and its managers, requiring separate counsel. *Compare Stepak ex rel. S. Co. v. Addison*, 20 F.3d 398, 404–05 (11th Cir. 1994) (disqualification required in derivative suit for firm who previously represented board-member defendants in criminal proceedings), *with Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1316 (3rd Cir. 1993) (disqualification not required in derivative suit for firm who simultaneously represented

9

corporation and individual manager defendants where there were no allegations of serious wrongdoing).

We announce no categorical rule governing dual representation in derivative litigation. Whether a company and the individual defendants are "opposing parties" for purposes of Rule 1.06(a) in derivative litigation requires consideration of the true extent of their adversity under the circumstances. The definition of "directly adverse" representation provided in the comments to the disciplinary rules provides useful guidance in derivative litigation, as elsewhere:

> Within the meaning of Rule 1.06(b), the representation of one client is directly adverse to the representation of another client if the lawyer's independent judgment on behalf of a client or the lawyer's ability or willingness to consider, recommend or carry out a course of action will be or is reasonably likely to be adversely affected by the lawyer's representation of, or responsibilities to, the other client. The dual representation also is directly adverse if the lawyer reasonably appears to be called upon to espouse adverse positions in the same matter or a related matter.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.06 cmt. 6.

To use the comment's language, the Murrin Group contends that KHH's "independent judgment on behalf of" BBT will be "adversely affected" by KHH's simultaneous representation of the Hickman Group. It also contends, as it must, that the dual representation will prejudice the Murrin Group. *See Nitla*, 92 S.W.3d at 422 (requiring showing of prejudice to movant seeking disqualification). Examining the Murrin Group's arguments, there is considerable overlap between the dual representation's alleged adverse effects on BBT and its alleged prejudice to the Murrin Group. This is not surprising. Naturally, the Murrin Group claims to be aligned with BBT and acting on its behalf. According to the Murrin Group, the Hickman Group's legal positions are incorrect and harmful to BBT. Unsurprisingly, the Hickman Group believes the Murrin Group's legal positions are incorrect and harmful to BBT. Stripped of the conceptual and procedural

10

baggage of its "derivative" claims, this case is about who controls the management of BBT—the Hickman Group by virtue of its majority interest, or the Murrin Group by virtue of the Company Agreement's unanimity provision. Either the Hickman Group is right, in which case its interests and BBT's are truly aligned, or the Murrin Group is right, in which case BBT is aligned with it instead.

Perhaps anticipating suits like this one—control-fights between LLC members couched as derivative actions—the legislature has provided that "if justice requires: a derivative proceeding brought by a member of a closely held limited liability company may be treated by a court as a direct action brought by the member for the member's own benefit." TEX. BUS. ORGS. CODE § 101.463(c). For purposes of the disqualification motion, the trial court could have treated the derivative claims as claims "brought by the member for the member's own benefit," rather than disqualifying KHH based on the procedural complexities introduced by the derivative claims. Indeed, if the derivative claims are treated as direct claims, as the statute permits, the Murrin Group's case for disqualification essentially vanishes.

On top of that, none of the other "facts and circumstances" presented to the trial court supported disqualification. At the time the trial court considered the disqualification motion, the case was nearly ready for trial. The Hickman Group and the Murrin Group were fully adverse. Both sought to control BBT. BBT's alignment as a party raised complex questions about the nature of derivative suits but was ultimately immaterial to the core merits question: Which ownership group has authority to control BBT? That question could be vigorously and fairly litigated by the parties and counsel currently before the court, and the resolution of it would resolve the nagging question of BBT's alignment. No showing was made that KHH possessed confidential

11

information belonging to BBT that prejudiced the Murrin Group and could not have otherwise been obtained from the Hickman Group. Moreover, the disqualification motion could have been brought much earlier in the litigation, as KHH's dual representation had long been known to all. All these facts and circumstances support the trial court's decision not to disrupt the existing alignment of parties and counsel on the eve of trial.

Finally, the Murrin Group contends that allowing KHH to represent both BBT and the Hickman Group will confuse the jury, to the detriment of the Murrin Group, by creating the false impression that the Hickman Group speaks for BBT or that the two are one and the same. But even assuming the validity of this concern, the Murrin Group does not explain why the severe remedy of disqualification is the only way to address it. The Murrin Group is free to seek jury instructions or other parameters for the conduct of trial that would ensure an even playing field. At bottom, this is a fairly straightforward case about which ownership group controls the company's decisions. A jury is unlikely to have any problem identifying the two ownership groups and their counsel. It is unclear why a jury would need to be told anything at all about the question of which lawyers have authority to represent the company itself. It is also unclear how the answer to that question would have any practical impact on the case, which boils down to a fight between the Murrin Group and the Hickman Group, both of which are well represented by the lawyers of their choice. The trial court did not abuse its discretion by declining to use the severe remedy of disqualification to address the Murrin Group's concern about jury confusion.

In sum, the trial court did not abuse its discretion by denying the motion to disqualify. Mandamus relief as to that motion is denied.

12

### C.  Rule 12 Motion to Show Authority

Rule 12 of the Texas Rules of Civil Procedure provides:

> A party in a suit or proceeding pending in a court of this state may, by sworn written motion stating that he believes the suit or proceeding is being prosecuted or defended without authority, cause the attorney to be cited to appear before the court and show his authority to act.

TEX. R. CIV. P. 12.  Upon such a motion, "the burden of proof shall be upon the challenged attorney to show sufficient authority to prosecute or defend the suit on behalf of the other party." *Id.*  If the challenged attorney fails to show sufficient authority, "the court shall refuse to permit the attorney to appear in the cause, and shall strike the pleadings if no person who is authorized to prosecute or defend appears." *Id.*

In support of its Rule 12 motion, the Murrin Group contended that KHH lacks authority to represent BBT because the unanimity requirement of the Company Agreement prevented the Hickman Group from hiring counsel for BBT.  The Hickman Group's primary response was that the powers afforded Governing Persons by the Certificate of Formation constituted "sufficient authority" for a majority of Governing Persons to hire counsel for KHH under these circumstances.

To begin with, we disagree with the Murrin Group's suggestion that the trial court effectively decided the merits of its claims by denying the Rule 12 motion.  The trial court's ruling that KHH showed "sufficient authority" to represent BBT was not a merits decision on ultimate issues such as the meaning of the company documents and control of the company moving forward.  It had nothing to do with the central merits question of whether dismissal of Minick as Managing Member required unanimity.  Those questions remain for resolution later.  Denial of the Rule 12 motion no more decided the merits than did denial of the Murrin Group's summary judgment motion.

13

To resolve the Murrin Group's request for mandamus relief on the Rule 12 motion, we can assume without deciding that the Murrin Group is correct that the Company Agreement required unanimous consent of the owners before BBT could hire KHH. To obtain mandamus relief, the Murrin Group must do more than show the trial court abused its discretion by misinterpreting BBT's governing documents. It must also establish its lack of an adequate remedy if mandamus relief is not granted. *In re H.E.B. Grocery Co.*, 492 S.W.3d at 302. It has not done so.

The Murrin Group alleges three primary harms caused by the denial of the Rule 12 motion. None of these, it argues, can be adequately remedied absent mandamus relief: (1) the Murrin Group has been denied its contractual right to veto BBT's litigation counsel; (2) the jury will be confused and prejudiced against the Murrin Group if it is told that KHH represents both BBT and the Hickman Group; and (3) payment of KHH's legal bills comes from BBT, including the Murrin Group's interest, requiring the Murrin Group to essentially fund their opposition. Under these circumstances, none of these alleged harms satisfies the lack-of-adequate-remedy requirement.

To the first point, the normally adequate remedy for breach of a contractual right is damages. Should the Murrin Group succeed on the merits, whether at trial or on appeal, it may pursue relief for losses suffered due to the unauthorized hiring of KHH. The Murrin Group also complains of its irretrievable loss of the right to control which lawyers represent BBT. We have difficulty identifying how, in this context, the loss of that right harms the Murrin Group, other than monetarily. The heavily litigated question of whether KHH properly represents "the company" seems unlikely to have any practical impact on the outcome of the already well-lawyered dispute between the Murrin Group and the Hickman Group over control of BBT. The only concrete, non-monetary harms the Murrin Group alleges are the possibility of jury confusion and the unfairness

14

of being made to contribute towards its opponent's legal bills. We have already described how the jury-confusion concern can be otherwise remedied. And determining which group ultimately controls BBT—including its legal advisors—is a merits question that is yet to be resolved. Adequate remedies exist for recovery of any legal fees that may turn out to have been improperly paid from the Murrin Group's interest in BBT.[3]

Under these circumstances, the relators have not established the lack of an adequate remedy if mandamus relief is not granted. Accordingly, mandamus relief as to the Rule 12 motion is denied.

### III. Conclusion

Gone are the days when a family feud over a dance hall and saloon in the Fort Worth Stockyards would be solved by six-shooters. These days, we use lawyers instead of lead. Thank goodness for that. As complicated, expensive, and frustrating as litigation can be, it sure beats a shootout at the stockyards. Today's denial of mandamus relief allows this dispute to proceed toward that peaceful alternative to shootouts known as trial, where both sides may be represented by their chosen lawyers.

Although its mandamus petition is denied, the Murrin Group may or may not ultimately succeed in this litigation. We express no opinion on the likelihood of success of either party on the merits. In this mandamus posture, we look only to whether the relators established both a clear

---

[3] Some courts have found the lack of an adequate appellate remedy for denial of a Rule 12 motion. *See, e.g.*, *In re Salazar*, 315 S.W.3d 279, 286–87 (Tex. App.—Fort Worth 2010, orig. proceeding) (granting mandamus relief because "[a]n appeal after final judgment would be inadequate because the time and money for trial as the parties are currently named and aligned would be wasted in enduring a proceeding that concludes without a binding judgment"). We do not cast doubt on those holdings or on the possibility that an adequate appellate remedy may not exist in some Rule 12 disputes. We hold only that in the unique circumstances of this case, the relators have not established that they lack an adequate remedy by which to redress the improper denial of the Rule 12 motion.

15

abuse of discretion and the lack of an adequate remedy at law as to the two trial court rulings they challenge. We conclude the relators did not establish a clear abuse of discretion as to the motion to disqualify. We further conclude the relators did not establish the lack of an adequate remedy at law as to the Rule 12 motion. The petition for writ of mandamus is denied.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** December 20, 2019